*This opinion will be unpublished and*
*May not be cited except as provided by*
*Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1695**

State of Minnesota,
Respondent,

vs.

Larry Kenneth Karius,
Appellant.

**Filed June 20, 2016**
**Affirmed**
**Ross, Judge**

Dakota County District Court
File No. 19HA-CR-11-2402

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Amy A. Schaffer, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, F. Richard Gallo, Jr., Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Ross, Judge; and Smith, Tracy M., Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

Larry Karius was angry and intoxicated in a Dakota County bar when he told the bartender and patrons who were trying to restrain him that he was going to return and kill

them. Karius pleaded guilty to making terroristic threats, and the district court stayed the imposition of his sentence on probationary terms. Karius failed to complete a chemical-dependency evaluation and anger-management therapy and refused to submit to testing or abstain from using drugs. The district court revoked his probation and executed his prison sentence. Because Karius's assertion that the district court revoked his probation reflexively is belied by the record, we hold that the court acted within its discretion, and we affirm.

**FACTS**

This case originates from a July 2011 barroom fracas. Larry Karius was drunk at the Shenanigans bar in Dakota County, and things became personal and "all blew up" when he told the bartender, "I see why Tom divorced you." The bartender told him to leave. Later asked, "And you became angry about that?," Karius explained, "I wanted to finish my beer." The disagreement got physical, and during the tussle Karius told the bartender and the patrons who were trying to restrain him that he was going to return and kill them.

The state charged Karius with one felony count of terroristic threats and two misdemeanor counts of fifth-degree assault. Karius pleaded guilty to terroristic threats and the state dismissed the other charges. The district court stayed imposition of Karius's sentence in April 2013 with probationary terms.

Eleven months later, in March 2014, Karius admitted that he violated his probation in various ways: he failed to complete anger-management therapy; he failed to complete a chemical-dependency evaluation; he left the state without permission and failed to return when his probation officer directed him to return; and he failed to abstain from illegal

drugs. The district court ordered him to serve 150 days in jail and reinstated his probation, adding the conditions that he complete a chemical-dependency evaluation and chemical-dependency and anger-management treatment while in custody.

Karius was back in custody in June 2015, again accused of violating his probation. He again admitted to various violations: he failed to complete a chemical-dependency evaluation; he failed to abstain from illegal drugs; and he failed to participate in urinalyses. Karius claimed that although he "probably wasn't ready for treatment before," he was indeed "ready for treatment now." The district court was dubious. It found Karius's change of heart to be "too little too late." It revoked his probation on the following findings and imposed the following sentence:

> You failed to minimally comply with probation, even provide a phone number contact information, show up for meetings, comply with any UAs, complete a chemical dependency evaluation, you were sentenced way back in April of 2013, and there's just a clear indication that you're not willing to cooperate or comply with the court orders or probation directives so I find that you're -- the violation was intentional and inexcusable, and that the need for confinement clearly in this case outweighs the policies favoring probation and it would unduly depreciate the seriousness of this original conviction if I were to continue you on probation and your probation was not revoked at this time. So I find confinement is necessary and I am going to execute your sentence and commit you to the Commissioner of Corrections for a period of 21 months, which consists of 14 months of imprisonment, 7 months on supervised release.

Karius appeals.

**D E C I S I O N**

Karius argues that the district court lacked a basis to revoke his probation. The district court has broad discretion to determine whether sufficient evidence supports revocation, and this court will not reverse that determination unless there has been a clear abuse of that discretion. *State v. Austin*, 295 N.W.2d 246, 249–50 (Minn. 1980). Before a district court may revoke probation, it must identify a specific probationary condition violated, find that the probationer's violation was either intentional or inexcusable, and find that the need to confine the probationer outweighs the policies that favor probation. *Id.* at 250. In weighing the third factor, the court should consider the original offense and the probationer's intervening conduct in relation to three subfactors: (1) whether confinement is necessary to protect the public from the probationer; (2) whether the probationer needs correctional treatment best provided in confinement; and (3) whether failing to revoke probation would unduly depreciate the violation's seriousness. *State v. Modtland*, 695 N.W.2d 602, 606–07 (Minn. 2005). The district court must make specific findings that convey the "substantive reasons for revocation and the evidence relied upon" and may not simply "recit[e] the three factors and offer[] general, non-specific reasons for revocation." *Id.* at 608. We review de novo whether the district court made the necessary *Austin* findings. *Id.* at 605.

The district court here found that the *Austin* factors were satisfied. Focusing on the third *Austin* factor, Karius argues that the district court reflexively revoked his probation and that it inadequately analyzed whether he could avoid antisocial behavior. His argument is not convincing.

4

Karius acknowledges that the district court found that his confinement is necessary, but he argues that we should reverse because the court "never said what confinement was necessary for." Because the district court never specified that protecting the public from his criminal conduct necessitated the confinement, argues Karius, we must reverse. We are not convinced. Although the district court's analysis was brief, the judge's comments demonstrate a nonreflexive treatment of the circumstances. By telling Karius, "[I]f I look at your history, clearly, when you drink, you lose control. You get into trouble," the district court judge implicitly held that incarcerating Karius was necessary to prevent his chemical-inspired violence. The judge did not buy Karius's claim that he is ready for treatment, observing that he "failed to minimally comply with probation" and that "there's just a clear indication that [he's] not willing to cooperate or comply with the court orders or probation directives." The district court's assessment is well supported by Karius's violation history. Karius admitted to failing four probationary conditions just 15 months before he admitted to failing three more conditions (and he was in jail for 5 of those 15 months). The record leaves no room for us to doubt the district court's patience and leniency, and certainly no room to doubt its careful consideration of the third *Austin* factor.

The district court did not abuse its discretion.

**Affirmed.**